NOT DESIGNATED FOR PUBLICATION

No. 125,604

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TERRY EUGENE ROSS JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Submitted without oral argument. Opinion filed June 14, 2024. Reversed and remanded with directions.

*Jacob Nowak*, of Kansas Appellate Defender Office, for appellant.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before COBLE, P.J., GREEN, J., and TIMOTHY G. LAHEY, S.J.

PER CURIAM: Terry Eugene Ross, Jr. appeals his convictions for multiple crimes in a consolidated case. Ross raises six issues on appeal, four which require careful consideration. First, he argues that the district court erred by consolidating the cases. Second, he argues that prosecutorial error during opening argument deprived him of a fair trial. Third, he contends that the State violated an order in limine by publishing evidence of an inadmissible rape allegation. Fourth, he contends that the district court answered a jury question during deliberation with a legally inaccurate answer. Fifth, he argues that his convictions for aggravated criminal sodomy and criminal sodomy are mutually

1

exclusive and logically inconsistent because they arise from a single incident. And finally, he argues that the cumulative effect of all errors deprived him of a fair trial. Because we conclude that cumulative error deprived Ross of a fair trial, we reverse his convictions and remand for separate trials.

FACTS

A.R. married Ross in 2016, making him the stepfather of her children, H.L. and D.L. A.R. and Ross had a baby together in 2019. On April 30, 2019, Ross became upset with A.R. because she was not eating her food. Ross was a personal trainer, and they were always counting calories, so he tried to stop A.R. from dumping her leftover food in the sink. Ross grabbed A.R.'s wrist. She jerked her wrist away, hit herself in the face, fell backwards, hit the counter, and blacked out. Ross shot a gun into the floor near A.R.'s head and yelled at her to wake up. A.R. got up and tried to run away. Ross grabbed the hood of her sweatshirt, choking her. A.R. slipped, hit her head on the floor, and lost consciousness again. When she woke up, she had a black eye, a cut on the bridge of her nose, a busted lip, a swollen cheek, and a bruise on her right arm.

H.L. and D.L. testified at trial that they were downstairs when this incident occurred. They heard yelling and a gunshot. They testified that Ross called them upstairs to clean up the mess. They saw blood on the floor and things thrown on the floor. They cleaned up while A.R. was in the shower.

Ross testified to a different version of events. He stated that A.R. was angry with him because she discovered he had been texting other women. A.R. demanded Ross' phone. When he refused, she left the room, returned with a gun, and fired it into the floor. Ross gave her the phone, but when she walked away, he grabbed the back of her hoodie and yanked her to the floor. Ross testified that he injured A.R. in a struggle to get the gun away from her.

Because of her injuries, A.R. did not go to work for a week. When A.R. returned to work, she still had a black eye. She told her supervisor what was going on in her home and to call the police if she did not come to work.

On May 17, 2019, A.R. was late for work and a supervisor called the police because he was concerned for her safety. A.R. testified that Ross was angry that morning because H.L. and D.L. were not ready on time to attend H.L.'s middle school graduation. A.R. testified that Ross threatened to rip her dress off when they got to the graduation ceremony. D.L.'s testimony confirmed that Ross threatened to rip off A.R.'s dress. While at the graduation, because the day had been so volatile, A.R. texted a coworker to send police if A.R. did not show up to work.

Police officers arrived at A.R.'s home and spoke with her and her daughters H.L. and D.L. H.L. and D.L. told the officers that Ross had touched them sexually. The police took A.R. and her daughters to a hospital. From the hospital, A.R. took her daughters to a hotel, then to a shelter, then to Chicago. Ross caught up with them in Chicago and convinced A.R. to return to Wichita while her daughters stayed with family.

In July 2019, A.R. used a code word with a coworker that they set up if things were bad at home and A.R. needed someone to call 911. A.R. used the code word because Ross confined her in the basement with handcuffs and a cord. He also strangled her. The police arrived and took Ross into custody. While Ross was in custody, A.R. obtained a protection from abuse order, but Ross repeatedly contacted her from jail.

While the case was pending, A.R.'s family members talked to H.L. and D.L. about the sexual abuse allegations they had made against Ross. A.R. testified as follows: "My family was, like, writing out statements and telling them to just say this and not other things and that's why we were saying they were being coached. So my family had—they were intervening at this point as well." H.L. testified that Ross began abusing her when

3

she was 12 years old. According to H.L., the abuse started at a previous residence before the family moved to the location of A.R.'s domestic violence allegations. H.L. described multiple events generally, telling the jury that Ross began by touching her breasts and butt over her clothes. H.L. stated that the conduct progressed to Ross performing oral sex on and digitally penetrating her. H.L. testified that the touching occurred at the first house and continued when they moved to a second house. Finally, H.L. told the jury that at the second house Ross attempted to penetrate her with his penis. H.L. told the jury that A.R. was never in the house when the alleged abuse took place. The timeline is difficult to reconstruct from H.L.'s testimony.

Dalena Mar, a child specialist supervisor with the Kansas Department for Children and Families, testified that she interviewed H.L. in May 2019. In that interview, H.L. generally described three events to Mar, beginning with H.L. claiming that Ross fondled her breast and butt. Next, H.L. told Mar that Ross performed oral sex on her and penetrated her with his fingers and penis, outlining a time frame that overlapped her 14th birthday. And H.L. told Mar about the final incident, describing that in May 2019 Ross performed oral sex on her and penetrated her with his fingers and penis.

Brittany Scoggins, a sexual assault nurse examiner (SANE nurse), testified that she examined H.L. in May 2019. Scoggins discovered some injury to H.L.'s genitals which by necessity indicated some form of penetration. But the vaginal injuries that Scoggins observed could possibly be consistent with use of a sex toy. A.R. testified that she had purchased H.L. a vibrator, and other testimony confirmed that H.L. had actively used it near this time frame. DNA tests of swabs collected during the SANE nurse's examination did not detect Ross' DNA.

D.L. testified that Ross touched her butt over her clothes. D.L. also testified about an argument related to D.L. and H.L.'s younger half-sister, the child that A.R. and Ross had together. D.L. explained that Ross was "[y]elling at me, getting in my face, telling

4

me that he was upset, that I should have been taking care of her." D.L. testified that during this incident, Ross slapped her in the face.

The parties stipulated to the existence of various protective orders issued by the district court because of the domestic violence and sexual abuse charges. Detective Patricia Brock testified that she reviewed telephone calls that Ross made from jail. Brock testified that (1) Ross made seven calls to A.R. on July 11, 2019 (six incomplete calls and one completed call); (2) Ross made six incomplete calls on July 22, 2019; (3) Ross made 16 calls to A.R. on July 23, 2019 (13 incomplete calls, two completed calls, and one voicemail); and (4) Ross left one voicemail and made three completed calls to A.R. in August 2019. The State also presented the jury with a table chart of eight calls and five protective orders to designate which voicemails and completed calls constituted the 31 charges of violating a protective order.

For the attacks on A.R., the State charged Ross in case No. 19CR1859 with aggravated assault, in violation of K.S.A. 21-5412(b)(1); domestic battery, in violation of K.S.A. 21-5414(a)(1); criminal possession of a weapon, in violation of K.S.A. 2018 Supp. 21-6304(a)(2); unlawful discharge of a firearm in a city, in violation of K.S.A. 21-6308a(a); two counts of aggravated domestic battery, in violation of K.S.A. 21-5414(b)(1); two counts of criminal threat, in violation of K.S.A. 21-5415(a)(1); and two counts of aggravated kidnapping, in violation of K.S.A. 21-5408(b). For ease of communication, Ross refers to case 19CR1859 in his brief as "the domestic violence charges."

Because of the disclosures made by H.L. and D.L., the State charged Ross in case No. 19CR2036 with aggravated criminal sodomy, in violation of K.S.A. 21-5504(b)(1); battery, in violation of K.S.A. 21-5413(a)(1); two counts of criminal sodomy, in violation of K.S.A. 21-5504(a)(3); and four counts of aggravated indecent liberties with a child, in

5

violation of K.S.A. 21-5506(b). For ease of communication, Ross refers to 19CR2036 in his brief as "the sexual abuse charges."

For his continued contact with A.R., the State charged Ross with 2 counts of violating a protection from abuse order in violation of K.S.A. 21-5924(a)(1) in case No. 19CR1959; 9 counts of violating a protective order in case No. 19CR2068; and 20 counts of violating a protective order in case No. 19CR2530. For ease of communication, Ross refers to these three cases involving multiple violations of a protective order as "the protective order charges."

The State moved to consolidate Ross' five cases for trial, arguing that the offenses were of the same or similar character and that there was a common scheme or plan. Ross did not contest joinder of the three criminal complaints involving phone calls made from jail—the protective order charges. After oral argument, the district court consolidated the cases, finding that the crimes charged were of the same or similar character, were connected, constituted a common scheme or plan, and the probative value of consolidation outweighed any undue or unfair prejudice. Specifically, the district court found the charges had "common evidentiary threads" as follows:

(1) All five cases would be tried before a jury;
(2) Fifty of 51 crimes were person crimes;
(3) The domestic violence and sexual abuse charges would require the same nature and type of evidence, principally the testimony of the alleged victims;
(4) The principal witnesses would be the same three family members of Ross;
(5) Fifty of the 51 crimes occurred in the eight-month period between January and August 2019. "During this period, defendant demonstrated a consistent, interrelated and sustained pattern of alleged criminal conduct and victimization to the three persons closest to him and living under the same roof.";

6

(6) Excluding the phone calls from jail, the remaining charges all occurred in the home that Ross shared with the victims. A.R. may have also received some if not all of the jail calls at that home as well;

(7) The domestic violence and sexual abuse charges involved physical acts of violence. Also, verbal threats of violence or other negative consequences were a common thread in all charges;

(8) The jail calls violated the protective orders that issued from the domestic violence and sexual abuse cases;

(9) "All five cases allege and involve acts of physical, emotional, or sexual abuse, as the defendant intimidated, manipulated and exercised control over the three females closest to him. This is the most distinct and 'common evidentiary thread' woven through the fabric of all five cases."

The district court also determined that the cases involved two or more acts constituting a common scheme or plan. The district court found that Ross' physical, sexual, and psychological acts against A.R., H.L., and D.L. constituted "a scheme and plan to manipulate and control the women in his home." The district court cited four categories of fact to support its finding that "defendant had an ongoing plan, pattern of behavior and relational structure with the alleged victims designed to physically and emotionally manipulate and cont[r]ol [A.R.], [H.L.,] and [D.L.]." The district court stated the following: (1) The domestic violence and sexual abuse charges all involved physical harm; (2) the State's evidence in those cases involved physical and emotional threats; (3) the evidence involved Ross making emotionally disparaging comments to A.R.; and (4) in the domestic violence, sexual abuse, and protective order cases the State's evidence showed that Ross made intimidating and manipulative statements and actions.

The district court also found that the domestic violence and sexual abuse charges precipitated the protective order charges: "Defendant was arrested and in the county jail on the two felony cases when he allegedly made the jail calls resulting in the three

7

misdemeanor cases. The two felony cases provide the context, form the basis and give substance to the 33 crimes charged in the three misdemeanor cases." Also, the district court found that Ross provided evidence of the felony crimes while committing the misdemeanor crimes because he directly and substantively referenced the felony cases during the jail phone calls. Under this finding, the district court connected the jail calls to the domestic violence case and the jail calls to the sexual abuse case, but the district court did not connect the domestic violence and sexual abuse cases to each other.

Finally, the district court found that the probative value of consolidating the cases outweighed the prejudicial effect, would not prevent a fair trial, would promote judicial economy, and would allow safeguards for Ross: "[T]he law provides defendants with protection as reflected in PIK 4th 68.060. . . . [I]t provides defendant protections he would not otherwise be afforded if the cases were litigated in sequential trials where each separate incident could be admitted as under K.S.A. 60-455(b) or (d)." But the district court did not include an analysis of whether each separate incident could be admitted under K.S.A. 60-455.

The protective jury instruction referenced by the district court directs the jury that each crime charged is a "'separate and distinct offense,'" and that the jury "'must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge.'" But in opening argument, the State directed the jury to review the charges collectively as a course of conduct as follows:

> "It's not about any one incident. It's about a course of conduct, a course of terrorizing and controlling an entire household and treating them like the property that they were to him. They were his to touch any time he wanted in any way he wanted, and that's exactly what he did and they're going to tell you about that."

8

At the conclusion of trial, the jury acquitted Ross of some charges while convicting him of others. The jury heard A.R.'s testimony that Ross held a knife to her throat sometime between April 30 and May 17, 2019, and the State charged Ross with aggravated assault for this incident. The jury acquitted Ross on this charge. A.R. also testified that Ross bound her with handcuffs and an electrical cord on July 2, 2019, and the State charged him with aggravated kidnapping, aggravated domestic battery, and criminal threat for his alleged actions associated with this incident. The jury acquitted him of these charges, as well as criminal discharge of a firearm. But the jury convicted Ross of all other charges. The district court sentenced Ross to a controlling sentence of life in prison without possibility of parole for 75 years (three hard 25 sentences), followed by a consecutive 382 total months (31 years, 10 months) in confinement.

Ross timely appeals.

ANALYSIS

I. *Did the district court err by consolidating Ross' five cases?*

A. *Motion to consolidate*

Ross argues that the district court erred in consolidating cases because the charges are not of the same or similar character and are not part of a common scheme or plan. The State argues that Ross fails to show that no reasonable person would agree with the district court's decision to consolidate the cases and that if the district court erred such error was harmless.

The appellate court reviews potential joinder errors using a three-step analysis, applying a different standard of review at each step. First, the district court determines whether joinder is permitted under K.S.A. 22-3203, which allows a court to try together

9

multiple complaints against a defendant if the State could have brought the charges in a single complaint. There are three conditions for this listed in K.S.A. 22-3202(1), and whether one of these conditions is satisfied is a fact-specific inquiry, meaning appellate courts review the district court's factual findings for substantial competent evidence and the legal conclusion that one of the conditions is met de novo. Second, because K.S.A. 22-3202 provides that the district court may charge these types of cases together, a district court has discretion to deny a request to consolidate even if a statutory condition is met, meaning appellate courts review that decision for abuse of discretion. Finally, if an error occurred at one of these steps, the appellate court determines whether the error resulted in prejudice under K.S.A. 2023 Supp. 60-261, which requires determining whether it affected a party's substantial rights. *State v. Carter*, 311 Kan. 783, 793, 466 P.3d 1180 (2020).

Ross first challenges the district court's decision to join the cases. A district court is statutorily permitted to order two or more cases tried together if the crimes involved could have been joined in a single complaint, information, or indictment. K.S.A. 22-3203. Two or more crimes may be charged in separate counts of the same complaint, information, or indictment if the crimes:  (1) are of the same or similar character; (2) are based on the same act or transaction; or (3) are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan. K.S.A. 22-3202(1).

1. *Consisting of the same or similar character*

The district court relied on two criteria from K.S.A. 22-3202(1) in granting the State's motion to consolidate. The district court's first reason was its finding that the domestic violence, sexual abuse, and violation of protective order charges shared similar characteristics. Thus, the district court relied first on the "same or similar character" condition precedent of K.S.A. 22-3202(1).

10

In *State v. Barksdale*, 266 Kan. 498, 973 P.2d 165 (1999), our Supreme Court discussed the determination of whether crimes are of the same or similar character to permit joinder. "'Several separate and distinct felonies may be charged in separate counts of one and the same information, where all of the offenses charged are of the same general character, requiring the same mode of trial, the same kind of evidence, and the same kind of punishment.'" 266 Kan. at 507 (quoting *State v. Hodges*, 45 Kan. 389, 392, 26 P. 676 [1891]).

The *Barksdale* court repeated a warning against relying solely on generalities when considering whether joinder was proper:

> "'That offenses must be of the same general character is not always a sound test of joinder. In this instance the two crimes charged were of the same general character, in that they both involved force and violence to the person. That, however, would not necessarily be sufficient. To illustrate: As the culmination of a long-standing quarrel about a line fence, a farmer kills his neighbor. He goes to town, and the same afternoon, while in an excited frame of mind, he becomes involved in an altercation about a business matter, and makes an assault with some kind of deadly weapon with intent to kill. While the offenses are of the same general character, there should be separate informations and separate trials. The only reason this is so is, there would inevitably be some jumbling of the two cases at the trial, which would tend to prevent that concentrated consideration of each case which is indispensable in matters of such gravity.'" 266 Kan. at 508 (quoting *State v. Thompson*, 139 Kan. 59, 61-62, 29 P.2d 1101 [1934]).

Here, the district court found that the sexual abuse charges—that is, aggravated criminal sodomy, two counts of criminal sodomy, and four counts of aggravated indecent liberties with a child—were of a same or similar character. The district court made extensive factual findings on this issue. Instead of contesting the substance of the district court's fact-findings, Ross challenges the legal conclusion drawn from those facts: that these crimes were of the same or similar character as the domestic violence charges and protective order charges under K.S.A. 22-3202(1).

11

The first fact on the district court's list is that all cases would be tried to a jury. Ross does not contest this simple and obvious fact itself. But the fact that all cases would be tried by a jury is not a sufficient fact to establish that the crimes are of the same or similar character. The same is true of the district court's second finding: that 50 of the 51 crimes are person crimes. But the taxonomy of person and nonperson is broad. The fact that the crimes fall within the same kingdom or phylum hardly establishes that they are within the same genus or species. Likewise, the fact of trying person crimes to a jury would not by itself be sufficient to establish the crimes were of the same or similar character.

Ross correctly argues that the district court found likeness out of unlikeness with its third fact-finding. The district court stated: "The charges in 19CR2036 and 19CR1859 require the same nature and type [of] evidence, principally the testimony of alleged victims. The three misdemeanor cases would include additional evidence of recorded calls. Evidence in 19CR2036 would likely include testimony regarding a sexual assault examination." Ross does not dispute the facts as found but does question the district court's application of this finding, citing *State v. Coburn*, 38 Kan. App. 2d 1036, 176 P.3d 203 (2008).

Ross asserts that the domestic violence charges should have been one trial, with the sexual abuse charges in another trial, and the violation of a protective order charges in another trial. In two different ways, the district court's finding on the nature and type of evidence illustrates that three trials would have been appropriate here.

First, the district court's finding is internally inconsistent. The district court found that some cases would require the same nature and type of evidence, but immediately pointed to differences in evidence. The district court found that A.R., H.L., and D.L. would testify on the domestic violence and sexual assault charges. But the district court immediately drew attention to the "additional" evidence of recorded calls. But the

12

recordings would not supplement the testimony of A.R., H.L., and D.L. To begin with, H.L. and D.L. were not witnesses to the jail calls that violated a protective order. And A.R. was not the witness that the State used to introduce the recordings, instead relying on the testimony of the investigating police officer. The district court found that the SANE nurse would testify about exam results on the sexual abuse charges. But the SANE nurse would not have testified on the domestic violence and protective order charges if they had been tried separately. The district court found that all the charges required the same nature and type of evidence while pointing out the differing evidence in the various charges, making the finding internally inconsistent.

Second, Ross correctly points out that the district court's finding is inconsistent with this court's opinion in *Coburn*. In *Coburn*, C.W. filed police reports alleging that Edward N. Coburn Sr. had inappropriately touched her daughters, S.W. and J.W. After C.W. learned that Coburn stole money and left town, C.W. found an Amtrak train schedule on the computer Coburn regularly used but also found what appeared to be child pornography. A jury convicted Coburn of six counts of aggravated indecent liberties with a child based on Coburn's lewd fondling or touching of S.W. and J.W. And the jury convicted Coburn of sexual exploitation of a child based on Coburn's possession of pictures on a computer depicting a child under 18 years of age engaging in sexually explicit conduct. This court reversed and remanded, directing the district court to hold one trial on the charges of aggravated indecent liberties with a child and a separate trial on the charge of sexual exploitation of a child. 38 Kan. App. 2d at 1061, 1069.

In *Coburn*, testimony about the different charges came from the same witnesses. But the *Coburn* court held that this did not mean the cases involved the same nature and type of evidence as follows:

"[T]he evidence necessary to prove the sexual exploitation charge and the aggravated indecent liberties charges was different. Although the State points out that some of the

13

witnesses were the same for all of the charges, there was no real overlapping proof for the sexual exploitation charge and the aggravated indecent liberties charges. In other words, when proving the sexual exploitation charge, the State's proof did not constitute a substantial proof of the aggravated indecent liberties charges or vice versa. Specifically, the child victims of the aggravated indecent liberties charges and their family members established that Coburn spent a lot of time on the computer and was the only person who accessed it. These witnesses' testimony, however, related only to a small portion of the State's case on the sexual exploitation charge and was different from their testimony relating to the aggravated indecent liberties charges. Moreover, we doubt that the State needed the child victims' testimony to establish Coburn's computer usage.

"Consequently, the State could prove the sexual exploitation charge without using any of the evidence needed to prove the aggravated indecent liberties charges. The aggravated indecent liberties charges were proved through the testimony of the child victims and those individuals whom they told about the incidents. On the other hand, the sexual exploitation charge required testimony from an FBI forensic examiner and an FBI agent working in child exploitation cases about the images found on the computer, the web sites that had been visited, and the history of the computer." 38 Kan. App. 2d at 1045-46.

Factually, *Coburn* is like this case, which similarly involves charges of aggravated indecent liberties with a child. The testimony in support of those charges came primarily from H.L., D.L., and the SANE nurse. The evidence at trial showed that A.R. was never present in the home when sexual abuse occurred. H.L. and D.L. testified about the domestic violence against A.R. that they heard from downstairs and cleaning up afterward. But their testimony on domestic violence did not involve statements related to sexual abuse. The primary witness on the domestic violence charges was A.R. The SANE nurse's testimony was not needed at all on the domestic violence charges. Finally, the bulk of the evidence related to the violating a protective order charges came in through the testimony of the investigating officer, not testimony from A.R., H.L., D.L., or the SANE nurse. Just as in *Coburn*, there was no real overlapping proof for the various charges.

14

The district court's next finding is substantially the same, focusing on witness testimony. The district court found as follows:

> "The principle [*sic*] witnesses in all five cases are [A.R.], [H.L.,] and [D.L.]. They are mother and daughters. They are wife and stepdaughters to defendant. They are familiar to defendant, and each other. None are strangers. They resided together in the same household. All three alleged victims will be witnesses in the two felony cases."

But the *Coburn* court pointed out that the same witnesses would present different testimony at separate trials on different crimes.

The district court also described the crimes having a close proximity in both time and space, occurring between January and August 2019 in the same house. Again, this case is like *Coburn*. Coburn lived with S.W. and J.W.'s grandmother. Some of the incidents of lewd fondling or touching occurred in their grandmother's house, and the child pornography was on a computer in their grandmother's house. But there was no real overlapping of proof for the sexual exploitation charge and the aggravated indecent liberties charges.

Ross also correctly disputes the grouping of facts by the district court. The district court stated: "In 19CR2036 and 19CR1859, the alleged crimes involve physical acts of violence against [A.R.], [H.L.,] and [D.L.]. There are additionally, verbal elements in the form of spoken threats of violence or negative consequences. Of course, all three misdemeanor cases involve verbal communication." The two felony cases involved physical violence, but the violation of protective order charges could not involve physical violence because they were committed through the phone. But the district court considered them together because Ross used verbal communication in each instance.

The district court also stated:  "All five cases allege and involve acts of physical, emotional, or sexual abuse, as the defendant intimidated, manipulated and exercised control over the three females closest to him. This is the most distinct and 'common evidentiary thread' woven through the fabric of all five cases." Ross correctly points out that sex offenses are not of the same general character as domestic violence offenses. He also notes that the offenses do not share similar motivations.

Again, *Coburn* is useful here because both cases involve multiple counts of aggravated indecent liberties with a child. The *Coburn* court stated the following:

> "Viewing the record in the light most favorable to the State, the similarities among all of the crimes in this case were that they involved minors, that they involved sex offenses, that they allegedly involved sexual gratification, that they were of a lewd nature, and that some of the crimes were alleged to have occurred at Coburn's residence. Nevertheless, the similarities seem to stop there.
> "Kansas sex offense laws are similar to those found in most states. Rape, sodomy, sexual battery, and indecent liberties with a child are the primary sex offenses. Further, these sex offenses can be broken down into three main categories:  (1) sexual intercourse, (2) sodomy, and (3) touching. Coburn's offense of sexual exploitation of a child does not fit within any of these categories. Moreover, Coburn's sexual exploitation charge and aggravated indecent liberties charges are not similar in character." 38 Kan. App. 2d at 1044-45.

The *Coburn* court added the following:  "[T]he sexual exploitation charge and the aggravated indecent liberties charges do not belong to the same class of crimes. The possession of pornographic computer images of minors is a crime distinct from the inappropriate touching of minors. As a result, the crimes were not of the same general type." 38 Kan. App. 2d at 1046-47. The crimes at issue here are similarly not of the same general type.

16

In fact, the offenses at issue here have less in common than the offenses in *Coburn*. In *Coburn*, the offenses involved minors, involved sex offenses, involved sexual gratification, and were of a lewd nature. The sexual abuse charges against Ross share those same traits, but the domestic violence charges involved A.R., who was not a minor. Also, the domestic violence charges are not sex offenses. The record contains no evidence that the domestic violence charges involved sexual gratification. And they were not of a lewd nature.

Ross correctly argues that sex offenses are unlike other offenses. Our Supreme Court has treated them differently in the context of propensity evidence as follows:

> "[M]odern psychology of pedophilia tells us that propensity evidence may actually possess probative value for juries faced with deciding the guilt or innocence of a person accused of sexually abusing a child. In short, sexual attraction to children and a propensity to act upon it are defining symptoms of this recognized mental illness." *State v. Prine*, 287 Kan. 713, 737, 200 P.3d 1 (2009) (*Prine I*).

Shortly after our Supreme Court's decision in *Prine I*, our Legislature amended K.S.A. 60-455 to add subsection (d), which allows propensity evidence in trials for sex offenses. *State v. Prine*, 297 Kan. 460, 461, 303 P.3d 662 (2013) (*Prine II*). Because K.S.A. 60-455(d) is the only exception to the general prohibition on the use of propensity evidence, our Legislature treats sex offenses as materially distinct from other crimes in this respect. From this standpoint, the charges involving sexual abuse of H.L. are of the same general character as the sex abuse charges involving D.L., but those charges are not like the charges of domestic violence against A.R. or charges of violating a court order protecting A.R. The charges were not of a sufficiently similar character to warrant joinder under K.S.A. 22-3202(1). The district court erred when it determined that the "same or similar character" condition precedent applied under K.S.A. 22-3202(1).

17

## 2. *Composing of two or more acts or transactions connected together or constituting parts of a common scheme or plan*

Ross correctly argues that the district court erred in finding that the acts constituted parts of a common scheme or plan. The State argues that the crimes "constituted part of his common scheme and plan to control and manipulate the women in his household." The district court made several findings of fact which Ross does not dispute and which are supported by substantial competent evidence in the record. This court reviews de novo whether those findings fit the "'two or more acts or transactions connected together or constituting parts of a common scheme or plan'" condition precedent of K.S.A. 22-3202(1). *Coburn*, 38 Kan. App. 2d at 1047.

In *State v. Donaldson*, 279 Kan. 694, 699, 112 P.3d 99 (2005), our Supreme Court applied the connected together language to determine whether the district court erred in consolidating cases. Wichita police sought Erick Donaldson in connection with the murder of Benny Zeigler. When police learned Donaldson could be contacted on his girlfriend's cell phone, they called and arranged to buy $100 of crack cocaine. After police arrested him during the exchange, Donaldson made statements about the Zeigler murder. The *Donaldson* court held that crimes are "connected together" under K.S.A. 22-3202(1) in three situations. 279 Kan. at 699.

The first situation occurs when the defendant provides evidence of one crime while committing another. In *State v. Anthony*, 257 Kan. 1003, 898 P.2d 1109 (1995), Andrew Juan Anthony sold drugs to an undercover officer and bragged about a murder and robbery during the sale. Our Supreme Court in *Anthony* held that the crimes were connected together by the incriminating statements made during the drug sale. 257 Kan. at 1016-17.

18

Ross never provided evidence of the domestic violence charges while committing the sexual abuse offenses. Conversely, Ross never provided evidence of the sexual abuse charges while committing the domestic violence offenses. These two felony cases are not connected together under the first *Donaldson* situation. But the district court found that Ross talked about both felony cases when he called A.R. from jail in violation of a protective order. In that sense, this is a case of first impression. None of the cases the district court cited in its consolidation order explain whether the three misdemeanor cases can act as the glue holding together two unconnected felony cases.

The second situation where our Supreme Court found charges to be connected together under K.S.A. 22-3202(1) occurs when some of the charges are precipitated by other charges. An example of this situation can be found in *Carter*. Brent J. Carter learned that Tatyana Crowe—who was pregnant with his child at the time—was talking and texting with Magic Jamerson, a member of a rival gang. Carter hit and threatened Crowe, resulting in the State charging him with battery and criminal threat against her. But Crowe pursued a relationship with Jamerson and Carter later shot at Jamerson, killing two bystanders. The *Carter* court held that the earlier battery of Crowe precipitated the later murders. 311 Kan. at 795, 797.

Ross correctly notes that the district court never found that the domestic violence charges precipitated the sexual abuse charges, or that the sexual abuse charges precipitated the domestic violence charges. But the district court found that the domestic violence charges precipitated the protective order charges. And the district court found that the sexual abuse charges precipitated the protective order charges.

On this point, the district court correctly applied the term precipitated. A common theme in our Supreme Court's analysis is a defendant committing a new crime while attempting to avoid conviction for an earlier crime. See *State v. Dreiling*, 274 Kan. 518, 555, 54 P.3d 475 (2002) (affirming the joinder of first-degree premeditated murder and

conspiracy to commit murder with conspiracy to commit perjury because the perjury would have prevented evidence of the defendant's motive for murder); *State v. Flynn*, 274 Kan. 473, 481, 55 P.3d 324 (2002) (same as *Dreiling*); *State v. Pondexter*, 234 Kan. 208, 216-17, 671 P.2d 539 (1983) (consolidating charges for unlawful possession of a firearm and aggravated assault of a law enforcement officer with charges of burglary and attempted murder because the intended murder victim was a witness against the defendant for the first two charges); *State v. Moore*, 226 Kan. 747, 750, 602 P.2d 1359 (1979) (joining charges of aggravated robbery and kidnapping with charges for corruptly influencing a witness and deprivation of property because the defendant committed the second two offenses while trying to avoid a conviction for the first two charges).

The district court found that the sexual abuse charges precipitated Ross to talk about how long he could be in prison because of the girls' allegations when he called A.R. in violation of a protective order. And the district court found that the domestic violence charges precipitated Ross to ask A.R. why she sent a code word to a friend, who then called police. The domestic violence charges precipitated protective order charges and the sexual abuse charges also precipitated protective order charges, but the domestic violence charges and sexual abuse charges did not precipitate each other. Nevertheless, the district court consolidated all cases together, treating the three misdemeanor cases as the glue holding together two felony cases which did not precipitate each other.

The third situation where our Supreme Court has found charges to be connected together under K.S.A. 22-3202(1) occurs when all of the charges stem from a common event or goal. *Donaldson*, 279 Kan. at 700. In *State v. Simkins*, 269 Kan. 84, 91, 3 P.3d 1274 (2000), our Supreme Court affirmed the joinder of first-degree murder and domestic battery charges involving two victims because both charges resulted from the victims' previous extramarital affair and the defendant's observation of the victims talking together. Here, the district court consolidated all five cases based on a much looser

20

definition of a common event or goal than those present in *Simkins*. See *Coburn*, 38 Kan. App. 2d at 1048.

The district court found that Ross' physical, sexual, and psychological acts against A.R., H.L., and D.L. constituted a scheme and plan to manipulate and control the women in his home. The district court cited four categories of fact to support its finding that Ross "had an ongoing plan, pattern of behavior and relational structure with the alleged victims designed to physically and emotionally manipulate and control" A.R., H.L., and D.L. The district court found that the two felony cases involved physical harm and physical and emotional threats against A.R., H.L., and D.L.; the felony cases and some jail calls involved intimidating and manipulative statements and actions against A.R., H.L., and D.L.; and the domestic violence case involved emotionally disparaging comments against A.R.

But caselaw applying this statutory factor does not show that a common scheme or plan to "manipulate and control the women in his home" fits the criteria. In *State v. Smith-Parker*, 301 Kan. 132, 158, 340 P.3d 485 (2014), our Supreme Court analyzed whether the district court properly consolidated cases under the third statutory condition—whether the cases or crimes were "based on two or more acts or transactions connected together or constituting parts of a common scheme or plan." See K.S.A. 22-3202(1). Willie Smith-Parker was convicted of the murders of Alfred Mack and Justin Letourneau. Mack died on June 13, 2009, when he was shot in his apartment during an apparent burglary. Letourneau died after being shot on June 19, 2009, during an apparent argument with Smith-Parker. The evidence at trial tended to show that Smith-Parker and Letourneau were accomplices in the burglary/homicide at Mack's apartment. But the evidence also showed that Smith-Parker told Letourneau to stop beating Letourneau's wife, which led to an argument, which led to Smith-Parker shooting Letourneau. The *Smith-Parker* court held that the crimes were connected together by the common evidence. "The ballistics evidence is the strongest among those ties. It demonstrated that

21

the gun used to shoot Mack was the same gun used to shoot Letourneau." 301 Kan. at 160.

Like in *Smith-Parker*, a firearm was involved in this case. Unlike *Smith-Parker*, the firearm does not tie criminal charges together. Ross had a firearm in his home during the domestic violence incident with A.R. A.R. testified that Ross fired into the floor, Ross testified that A.R. fired into the floor, and the jury acquitted Ross of unlawful discharge of a firearm within a city. No evidence showed that Ross used the firearm during the sexual abuse or protective order charges.

Ross argues that evidence does not show that the conduct of one crime was used to carry out the commission of another. He gives two examples. First, related to aggravated kidnapping of A.R., Ross argues that the evidence did not show that he confined A.R. so that he could commit the sexual assaults alleged against H.L. and D.L. Second, Ross argues that the evidence did not show that he committed domestic violence to keep A.R. from reporting sexual assaults against H.L. and D.L. Thus, Ross argues that the crimes were unrelated and not connected through a common scheme or plan. The evidence in *Smith-Parker* did not show that Smith-Parker shot Letourneau in an effort to keep the spoils of the burglary for himself. His disagreement with Letourneau was unrelated to the burglary a week before. The *Smith-Parker* court did not hold that the shootings were part of a common scheme but that they were connected together by common ballistic evidence.

Thus, walking through the statutory language one phrase at a time, we arrive at the final phrase—common scheme or plan. A district court may consolidate charges if the crimes charged "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." K.S.A. 22-3202(1). The domestic violence charges and sexual abuse charges are not of the same or similar character, as is readily apparent from

22

this court's holding in *Coburn*. The district court never found, and the State does not propose, that the charges are based on the same act or transaction. The domestic violence and sexual abuse charges involve two or more acts or transactions which are not connected together, as the comparison with *Smith-Parker* illustrates. The remaining determination is to find whether the acts or transactions constitute parts of a common scheme or plan. They do not.

The statutory language originates in 1970. Our Legislature codified previous Kansas caselaw governing joinder of offenses in one information and consolidation for trial of separate informations into K.S.A. 1970 Supp. 22-3202 and 22-3203. *State v. Thomas*, 206 Kan. 603, 609, 481 P.2d 964 (1971). Out of the 87 cases in which our Supreme Court has cited K.S.A. 22-3202, several cases have determined whether codefendants should be tried together under K.S.A. 22-3202(3), several others have analyzed whether crimes are of the same or similar character under K.S.A. 22-3202(1), but only six cases have determined whether the crimes constituted parts of a common scheme or plan under K.S.A. 22-3202(1).

In *Thomas*, our Supreme Court reversed the district court's decision to consolidate a murder case and an unrelated forgery case. The murder case stemmed from a body found in a car containing Thomas' fingerprint and witness accounts that Thomas and the victim were seen together earlier in the evening at a club. In contrast, the forgery case stemmed from checks and cards stolen from various victims over a few weeks. Our Supreme Court held that there was no showing that the respective acts were any part of a common scheme or plan, and the district court's decision to consolidate the cases for trial amounted to prejudicial error. 206 Kan. at 609-10.

In *State v. Stewart*, 219 Kan. 523, 528, 548 P.2d 787 (1976), our Supreme Court upheld the joinder of the charge of aggravated battery against John Sanders and the

charge of aggravated robbery against Sanders' wife because both crimes were based on the defendant's goal of getting Sanders to repay a debt.

In *State v. Boan*, 235 Kan. 800, 686 P.2d 160 (1984), our Supreme Court concluded that the district court did not abuse its discretion by consolidating two cases. Rather than use the phrase "common scheme or plan," the *Boan* court stated that "[t]he defendant's *modus operandi* was similar." 235 Kan. at 807. The *Boan* court noted that the same shotgun was used in both cases, the defendant's motive was the same in each case, and the affirmative defense in both cases was not guilty by reason of insanity. 235 Kan. at 807.

In *State v. Hanks*, 236 Kan. 524, 694 P.2d 407 (1985), Steven L. Hanks made repeated unwanted romantic advances to the victim at her workplace. Months later, Hanks broke into her bedroom, groped, and kissed her. Several months afterwards, a man with a ski mask and knife broke into the victim's bedroom, ripped off her clothes, beat her, sexually assaulted her, and choked her into unconsciousness. The victim testified that she believed the masked man was Hanks. The jury convicted him for both incidents. The *Hanks* court held that the charged crimes "may be said to be based on two or more acts constituting parts of a common scheme or plan, the object of which was intercourse with the victim, Miss B." 236 Kan. at 533.

In *State v. Woods*, 250 Kan. 109, 825 P.2d 514 (1992), Lamacey Woods was convicted of one count of sale of cocaine, one count of aggravated assault, two counts of aggravated battery, and two counts of aggravated kidnapping. The complaint alleged that *inter alia* Woods gave C.G. cocaine for resale. Later, Woods and accomplices beat C.G., burned him with an iron, applied electrical current to his feet, and cut him with a razor. The *Woods* court held that the district court did not abuse its discretion by joining the charges in one trial because "[a] reasonable person could find that these acts or

transactions were in furtherance of a common scheme or plan to sell drugs and to 'discipline' new recruits." 250 Kan. at 118.

Finally, our Supreme Court found that a repeated modus operandi showed a common scheme or plan in *State v. Hill*, 257 Kan. 774, 895 P.2d 1238 (1995). The *Hill* court affirmed the district court's finding of a common scheme or plan as follows:

"The four incidents occurred in the same neighborhood within a rather short time span. The residences involved were occupied by women only. The attacker in the two incidents involving rape was similarly garbed. The attacker gagged each woman. Before leaving he made each woman roll over on her stomach and placed a pillow on her head. In the two incidents involving rape, the victims awakened with the attacker on top of or leaning over the would-be victim. In the other two incidents, the woman awoke while the intruder was some distance away, which may have altered the intruder's plans. Similar items were taken from each residence. The pre-prepared slip-knotted twine also indicated a common plan." 257 Kan. at 780.

In applying this caselaw, this court found a common scheme or plan in *State v. O'Brien*, No. 124,524, 2024 WL 62815 (Kan. App. 2024) (unpublished opinion), *rev. denied* 318 Kan. ___ (April 26, 2024). Shawn P. O'Brien was convicted of three counts of aggravated indecent liberties with a child and five counts of sexual battery. Every victim's testimony outlined the same pattern of conduct: O'Brien began a massage normally before later touching the victim inappropriately during the same massage. The district court consolidated the cases despite the ages of the victims: a nine-year-old girl and college-age student athletes. The *O'Brien* court held as follows: "We find no flaw in the court's reasoning. It is true that the ages of the victims were different, but O'Brien's conduct each time remained the same. He touched each victim inappropriately during a massage." 2024 WL 62815, at *6. This court's reasoning in *O'Brien* echoes the *Boan* court's finding of a repeated modus operandi. But this highlights the difference from the

crimes charged against Ross. Ross' conduct in the domestic violence charges did not resemble his conduct in the sexual abuse charges.

This court also found a common scheme or plan in *State v. Dixon*, 60 Kan. App. 2d 100, 492 P.3d 455 (2021). De'Andrew V. Dixon was convicted on several counts related to three separate sexual assaults on different women. In all three assaults, the evidence showed that Dixon either forced or convinced the victim to get into his car, threatened her with a gun, drove to a separate location, and committed one or more sex crimes. This court held that all charges "stemmed from two or more acts or transactions constituting parts of a common scheme or plan." 60 Kan. App. 2d at 137.

This court analyzed a similarly repetitive modus operandi in *State v. Thomas*, No. 119,240, 2019 WL 3977820, at *4 (Kan. App. 2019) (unpublished opinion), as follows:

> "Thomas presents a very close issue for us to decide. Though the State's 'common scheme or plan' argument does not appear to us to be highly compelling, it does appear that it was Thomas' common scheme or plan to achieve sexual gratification by approaching unsuspecting women with whom he believed he had a relationship, making unwanted sexual advances, and then reacting violently when the advances were denied."

The *Thomas* court ultimately did *not* decide that the charges were properly consolidated, instead concluding that if the district court erred such error was harmless. 2019 WL 3977820, at *5-6.

This court did not adopt the State's common scheme or plan argument in *State v. Ewing*, No. 118,343, 2019 WL 1413962 (Kan. App. 2019) (unpublished opinion). The State contended that Jacob Coleman Ewing had a common scheme or plan in which Ewing used social media to contact each of the alleged victims, invited them to his home, gave them alcohol, and forcibly sexually assaulted them. Ultimately, the *Ewing* court

held that the district court did not err in consolidating cases because the crimes charged were of the same or similar character, not because they shared a common scheme or plan. 2019 WL 1413962, at *16-17.

A repeated modus operandi shared by all offenses is not the only common scheme or plan allowing consolidation under K.S.A. 22-3202(1). One crime—e.g., burglary of a pharmacy—could be part of a scheme to commit another crime—e.g., selling prescription drugs for guns. This court reviewed this archetypal example of a common scheme or plan in *State v. Gillespie*, No. 118,617, 2019 WL 1213173 (Kan. App. 2019) (unpublished opinion). Bradley Thomas Gillespie commonly exchanged drugs for firearms. One witness testified that he traded a Firestar M45 semiautomatic pistol to Gillespie in exchange for oxycodone. Another witness testified to watching Gillespie trading guns for drugs with other people but also personally giving Gillespie firearms in exchange for drugs. And a third witness testified that he saw Gillespie take guns in exchange for drugs, or as collateral for money owed him for drugs. The *Gillespie* court held that the firearm possession charges shared a factual relationship with the burglary of the pharmacy and the drug possession charges—all acts were done in furtherance of a common scheme or plan to sell drugs. 2019 WL 1213173, at *10.

The *Gillespie* court's reasoning aligns with the argument Ross offers here. Ross correctly notes that the evidence at trial did not connect the two felony cases. In *Gillespie*, Gillespie's burglary of a pharmacy furthered his common scheme or plan of selling drugs for guns. But no evidence showed that Ross committed aggravated kidnapping or domestic battery of A.R. to further his plan to gain access to her daughters. The crimes at issue here are not like the common scheme or plan at issue in *Gillespie*.

Thus, the analysis returns to our Supreme Court's hypothetical farmer in *Thompson*. The farmer kills his neighbor in a quarrel about a line fence. Then, in town that afternoon, "in an excited frame of mind," commits assault with a deadly weapon. 139

27

Kan. at 62. While the murder and aggravated assault are both violent person felonies, the State should charge them in separate informations and the district court should conduct separate trials. "The only reason this is so is, there would inevitably be some jumbling of the two cases at the trial, which would tend to prevent that concentrated consideration of each case which is indispensable in matters of such gravity." 139 Kan. at 62. The *Thompson* court did not leave open the possibility that the State could tie the different crimes together by offering up a unifying theory of the case such as the farmer having an ongoing scheme or plan to unleash his violent temper on the neighbors of his small town. Nor would the State be able to tie together several unrelated thefts, burglaries, and robberies committed across several years in various parts of a Kansas county with different weapons and different modi operandi under the unifying theory that the defendant likes money.

In moving to consolidate, the State contended that the crimes charged against Ross "constitute part of his common scheme and plan to control and manipulate the women in his household." The State also asserted that the phone calls from jail in violation of protective orders "demonstrated his continued desire to manipulate, control and influence [A.R.] as well as his refusal to obey the law." During opening argument, the State presented a unifying theory of the case to the jury as follows:

> "It's not about any one incident. It's about a course of conduct, a course of terrorizing and controlling an entire household and treating them like the property that they were to him. They were his to touch any time he wanted in any way he wanted, and that's exactly what he did and they're going to tell you about that."

Ross correctly argues that being controlling or manipulative is not traditionally thought of as a "'scheme or plan,'" but as negative character traits or qualities. A prosecutor might develop an emotional characterization of a defendant's personality based on the crimes charged and the evidence for them. But a prosecutor's mental

28

depiction of a defendant is not evidence. Statements of counsel are not evidence. *State v. Blevins*, 313 Kan. 413, 434, 485 P.3d 1175 (2021). The difficulty with the State's assertion about Ross' course of conduct is that it is a loose assertion not supported by evidence.

To illustrate, in *Prine I*, our Supreme Court cited the DSM-IV when it stated that "sexual attraction to children and a propensity to act upon it are defining symptoms of this recognized mental illness. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, pp. 527-28 (4th ed. 1994) (302.2-Pedophilia)." 287 Kan. at 737. So, the *Prine I* court tied one symptom, sexual attraction to children, to another symptom, the propensity to act on that attraction, by showing that they are two symptoms which have the same mental illness in common.

In this appeal, the State argues that Ross' acts related to A.R., H.L., and D.L. constituted a scheme and plan to manipulate and control the women in his home. But the State does not point to any evidence from a psychiatrist or other expert witness that testified that sexual abuse is related to domestic violence through a mental illness in common. No evidence addressed a connection between sexual abuse and domestic violence either in general or in Ross' case. The State fails to provide a citation to the record for any testimony that Ross had a common motivation—to manipulate and control the women in his home—for committing domestic violence, sexual abuse, and violating protective orders. An appellee's brief must contain a statement of facts without argument, or acknowledgment of appellant's statement of facts with corrections and supplemental statements, and "[t]he statement must be supported by references to the record." Supreme Court Rule 6.03(a)(3) (2024 Kan. S. Ct. R. at 37). Appellate courts "are not required to scour the record to uncover support for factual assertions in an appellate brief for which no meaningful citation to the record is provided." *State v. Oliver*, 39 Kan. App. 2d 1045, 1050, 186 P.3d 1220 (2008). From the record, there is no direct or circumstantial evidence that Ross had a scheme or plan to manipulate and control the women in his

29

home. Certainly, the State does not provide a record citation to such evidence. The most that can be said is that the State drew this conclusion from the collective charges and proceeded from this view of Ross' character.

The State simply makes broad-brush contentions that Ross planned to manipulate and control the women in his home. Assertions are not evidence. *Gillespie* helps to demonstrate the difference. The *Gillespie* court pointed to testimony from several witnesses who observed or directly engaged in Gillespie's drugs-for-guns scheme. 2019 WL 1213173, at *10. The State does not give a similar citation to support its assertion of Ross' manipulate-and-control scheme. The State recites the details of each charge and simply states that the common motivation behind them is manipulation and control.

Based on the above analysis, none of the conditions precedent under K.S.A. 22-3202(1) were met in this case to allow the joinder of charges. Ordinarily, joinder is the rule rather than the exception and the burden is on the defendant in his appeal following denial of a motion to sever to show that joinder was so manifestly prejudicial that it outweighed the dominant concern with judicial economy and compelled exercise of the court's discretion to sever. *State v. Bunyard*, 281 Kan. 392, 402, 133 P.3d 14 (2006) (quoting *United States v. Armstrong*, 621 F.2d 951, 954 [9th Cir. 1980]). But when a joinder occurs and none of the conditions precedent under K.S.A. 22-3202(1) have been met, this is prohibited not as a possible abuse of discretion by the district court, but as a matter of law. *State v. Gaither*, 283 Kan. 671, 685, 156 P.3d 602 (2007). So, as a matter of law, the domestic violence charges, sexual abuse charges, and protective order charges should not have been all consolidated together under K.S.A. 22-3202(1).

### 3. *Prejudice*

Also, when a misjoinder of charges has occurred, some prejudice almost always results. In other words, when joinder is improper, some prejudice is shown from the very

fact of the joinder. See *State v. Cruz*, 297 Kan. 1048, 1057-58, 307 P.3d 199 (2013) (describing the ameliorating effect of jury instructions on "the inherently prejudicial effect of trying a person on multiple counts"); see also *King v. United States*, 355 F.2d 700, 704 (1st Cir. 1966) ("[T]o try a single defendant for more than one offense involves prejudice."). But "error due to misjoinder requires reversal only if the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Bunyard*, 281 Kan. at 402 (quoting *United States v. Lane*, 474 U.S. 438, 449, 106 S. Ct. 725, 88 L. Ed. 2d 814 [1986]).

### a. *K.S.A. 2023 Supp. 60-455*

K.S.A. 2023 Supp. 60-455(a) establishes a general prohibition of the use of evidence to show that a defendant has a propensity or disposition to commit crime or civil wrong. K.S.A. 2023 Supp. 60-455(b) allows evidence to be introduced when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In 2009, our Legislature enacted the amended version of K.S.A. 60-455 to add subsection (d). *State v. Hart*, 44 Kan. App. 2d 986, 1011-12, 242 P.3d 1230 (2010). K.S.A. 2023 Supp. 60-455(d) permits the admission of evidence of another act or offense of sexual misconduct in a criminal action in which the defendant is accused of a sex offense.

Caselaw and the provisions of K.S.A. 22-3202(1) make it clear that joinder is not dependent on the admissibility test set forth in K.S.A. 2023 Supp. 60-455. *Gaither*, 283 Kan. at 688. Appellate courts have declined to find error when a district court refused to sever charges that were sufficiently similar such that evidence of one would be admissible under K.S.A. 2023 Supp. 60-455 in the trial of the other and no prejudice would result to the defendant. *State v. Westfahl*, 21 Kan. App. 2d 159, 163, 898 P.2d 87 (1995).

31

Nevertheless, K.S.A. 2023 Supp. 60-455 guides appellate courts in analyzing prejudice from improper joinder of charges because if evidence would have been inadmissible in separate trials, then prejudice results from consolidating charges and admitting otherwise inadmissible evidence. *Coburn*, 38 Kan. App. 2d at 1052-53.

Ross argues that he was prejudiced by the admission of evidence which would have been inadmissible if the three groups of charges were tried separately. He contends that the district court failed to determine if evidence of other crimes would have been admissible under K.S.A. 2023 Supp. 60-455(b) in any trial. And he correctly argues that evidence of sexual misconduct would have been admissible at a trial on only the sexual abuse charges but would not have been admissible in a trial on the domestic violence charges or a trial on the protective order charges. The State argues that the district court did not rule on admissibility and therefore did not err in stating that evidence only could or might be admissible under K.S.A. 2023 Supp. 60-455(b) or (d).

If this case had been tried as three trials, the evidence of the sexual abuse charges would not have been admissible in the trial of the domestic violence charges under K.S.A. 2023 Supp. 60-455 and vice versa. None of the eight material facts listed in K.S.A. 2023 Supp. 60-455(b) or some other material fact not listed in the statute was relevant. Sexual misconduct is admissible under K.S.A. 2023 Supp. 60-455(d) in cases where the charged crime is a sex offense. Thus, sexual abuse of H.L. would be admissible in a trial involving sexual abuse of D.L., and vice versa, if tried separately. But the State alleged those charges on the same complaint, and Ross does not argue he would have suffered prejudice from those charges being tried in one trial. See *State v. Plaskett*, 271 Kan. 995, 1020, 27 P.3d 890 (2001) (holding that the defendant was not prejudiced when charges of aggravated incest of adopted daughter and stepdaughter were tried together). But the exception in K.S.A. 2023 Supp. 60-455(d) would not allow the State to introduce evidence from the charges of sexual abuse against H.L. and D.L. in a trial on the domestic violence charges against A.R. Indeed, the State makes no argument that

evidence in each felony case could have been admitted in the other case under K.S.A. 2023 Supp. 60-455.

The misdemeanor cases involved phone calls that Ross made from jail in violation of a protective order. During these calls, Ross made statements which may have been admissible in either the domestic violence trial or the sexual abuse trial or both. But the facts that the district court did not rule on admissibility and that the defense had no opportunity to move in limine or otherwise seek to exclude inadmissible statements weigh in favor of finding prejudice. Ross was prejudiced by the joinder of charges in a single trial. See *Coburn*, 38 Kan. App. 2d at 1053.

b. *PIK Crim. 4th 68.060 (2016 Supp.)*

Ross and the State argue at length in their briefs about the significance of an ameliorating instruction under PIK Crim. 4th 68.060. The district court instructed the jury as follows:

> "Each crime charged against Terry Ross is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge. Terry Ross may be convicted or acquitted on any or all of the offenses charged. Your finding as to each crime charged must be stated in a verdict form signed by the Presiding Juror."

This instruction is modeled on PIK Crim. 4th 68.060. The district court, when consolidating cases, held that the jury instructions could provide sufficient safeguards to protect Ross' right to a fair trial. The district court stated the following:

> "To that end, as in any multiple-count trial, the law provides defendants with protection as reflected in PIK 4th 68.060. This instruction is required when there are multiple counts or consolidated cases. In this circumstance, it provides defendant

33

protections he would not otherwise be afforded if the cases were litigated in sequential trials where each separate incident could be admitted as under K.S.A. 60-455(b) or (d)."

Ross argues that the State's motion to consolidate and its arguments at trial undermined this jury instruction such that the jury could not decide each charge separately, uninfluenced by the other charges. He points to the State's opening argument statements that Ross "was the boss of his house," that the case was about a course of conduct instead of any one incident, and that the women of the house were property to him that he could touch in any manner he wanted. The State contends that its theory of the case did not undercut the protections of PIK Crim. 4th 68.060, arguing that appellate courts presume juries follow this instruction.

Nevertheless, Ross' point is well-taken that the State directed the jury to group the charges together while the district court instructed them to consider the charges separately. But the district court's order consolidating cases contains a different error. The district court found that the instruction "provides defendant protections *he would not otherwise be afforded* if the cases were litigated in sequential trials where each separate incident could be admitted." (Emphasis added.) But Ross *would* have been afforded the protection of PIK Crim. 4th 68.060. All five complaints alleged multiple charges and a jury instruction on multiple counts would have been appropriate if each complaint was tried individually or only the protective order charges were consolidated, making it three trials. Thus, the district court's finding on PIK Crim. 4th 68.060 was a red herring. The instruction would have been given in any event and has no real bearing on our analysis.

4. *Fatally prejudicial*

Even assuming for the sake of argument that one of the joinder requirements under K.S.A. 22-3202(1) was met, the district court was under a continuing duty to grant a motion for severance "to prevent prejudice and manifest injustice to the defendant." *State*

34

*v. Shaffer*, 229 Kan. 310, 312, 624 P.2d 440 (1981). The *Coburn* court recognized that "the requirements for joinder of charges under K.S.A. 22-3202(1) are similar to those concerning the joinder of two or more defendants under K.S.A. 22-3202(3)." 38 Kan. App. 2d at 1059. In support of this position, the *Coburn* court quoted our Supreme Court where it stated, in interpreting K.S.A. 22-3202(3), that "'even though the requirements of joinder are technically satisfied, the court should not join two defendants in one trial if either defendant will be prejudiced by the joinder. [Citation omitted.]' *State v. Aikins*, 261 Kan. 346, 360, 932 P.2d 408 (1997)." *Coburn*, 38 Kan. App. 2d at 1059.

Additionally, in pointing out what should guide the district court's inquiry concerning joinder, the *Aikins* court stated the following: that a defendant's right to a fair trial must be the overriding consideration of the district court. 261 Kan. at 360; see also *State v. Boyd*, 281 Kan. 70, 81, 127 P.3d 998 (2006) ("Separate trials should be conducted upon a showing of actual prejudice stemming from a joint trial and, in such a circumstance, the trial court should not join the complaints or, if the complaints have been joined, should sever the cases for trial.").

Because joinder was improper, this court's analysis moves to whether the joinder so prejudiced Ross as to demand reversal. The State bears the burden to show that "'there is no reasonable probability the error affected the trial's outcome in light of the entire record.'" *State v. Hurd*, 298 Kan. 555, 564, 316 P.3d 696 (2013). Here, the State directly jumbled the allegations and evidence preventing concentrated consideration of each case when it directed the jury to consider a course of conduct rather than any one incident. See *Thompson*, 139 Kan. at 61-62.

Furthermore, the record demonstrates juror confusion with the question: "May we, the jury, receive clarification on the State's definition of kidnapping?" before convicting Ross of one aggravated kidnapping charge and acquitting him on the other. On counts that the State charged in the alternative, the jury returned guilty verdicts on both

alternatives. And the nature of the domestic violence and sexual abuse charges could lead the jury to "conclude that the defendant deserves punishment because he is a general wrongdoer even if the prosecution has not established guilt beyond a reasonable doubt." *State v. Gunby*, 282 Kan. 39, 48-49, 144 P.3d 647 (2006). The evidence of sexual abuse was not overwhelming because there were no third-party witnesses and the forensic evidence was suggestive but did not detect Ross' DNA. See *State v. Brown*, 58 Kan. App. 2d 599, 626, 473 P.3d 910 (2020). Similarly, the jury did not credit all of A.R.'s testimony on the domestic violence charges because the jury acquitted Ross on some of those charges. Under this record, we are not persuaded that the consolidation did not affect the trial's outcome. See *Hurd*, 298 Kan. at 564; *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012).

Because the joinder was prejudicial to Ross in the sense of denying him a fair trial, justice requires a severance of the sexual abuse charges from the domestic violence charges and the protective order charges. As a result, we reverse Ross' convictions and remand this case for separate trials.

II. *Did the prosecutor commit prejudicial error in opening argument?*

Ross argues that the State committed prosecutorial error during opening argument. The State contends that Ross takes one comment, divorced from context, and amplifies its impact on the jury's verdict. Because the State's comment during oral argument did not prejudice Ross by itself, we hold that the comment alone does not warrant reversal but does contribute to cumulative error.

The appellate court uses a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022).

"To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

See also *State v. Fraire*, 312 Kan. 786, 791-92, 481 P.3d 129 (2021).

The statutory harmlessness test also applies to prosecutorial error, but when analyzing both constitutional and nonconstitutional error, appellate courts need only to address the higher standard of constitutional error. *State v. Carr*, 314 Kan. 744, 764, 502 P.3d 511 (2022).

Even if the prosecutor's actions are egregious, reversal of a criminal conviction is not an appropriate sanction if the actions are determined to satisfy the constitutional harmlessness test. *Sherman*, 305 Kan. at 114. Courts may still use prosecutorial misconduct as a descriptor for more serious occurrences. *State v. Chandler*, 307 Kan. 657, 695, 414 P.3d 713 (2018) (finding prosecutor's conduct to amount to prosecutorial misconduct in addition to prosecutorial error).

The extent of any ameliorating effect of a jury admonition attempting to remedy a prosecutor's error must be considered in determining whether the erroneous conduct prejudiced the jury and denied the defendant a fair trial. *State v. Barber*, 302 Kan. 367,

383, 353 P.3d 1108 (2015); see *State v. Rhoiney*, 314 Kan. 497, 501, 501 P.3d 368 (2021).

Appellate courts will review a prosecutorial error claim based on a prosecutor's comments made during voir dire, opening statement, or closing argument even without a timely objection, but the court may figure the presence or absence of an objection into its analysis of the alleged error. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

A prosecutor commits error by misstating the law. A prosecutor also errs when arguing a fact or factual inference without an evidentiary foundation. *State v. Watson*, 313 Kan. 170, 179, 484 P.3d 877 (2021).

Ross returns to the same comment by the State that he cited when arguing that the cases should not have been consolidated. He argues that the State's comment about a course of conduct during opening argument prejudiced his right to a jury trial. The State contends that Ross pulls two sentences out of six pages of trial transcript, removing important context. The State notes that its opening argument outlined events that occurred to bring about the charges against Ross, and the evidence for those events, before wrapping up in the following summary:

> "You're going to see the hole, a gunshot into the ground of the kitchen, the ceiling above the basement where those girls were. You're going to see the hole. You're going to see the ammunition and the holster and all of that.
> "It's not about any one incident. It's about a course of conduct, a course of terrorizing and controlling an entire household and treating them like the property that they were to him. They were his to touch any time he wanted in any way he wanted, and that's exactly what he did and they're going to tell you about that. After you hear from them and the other witnesses and after you see all the exhibits, I'm going to stand right here and I'm going to ask you to find him guilty of every single charge, because that's what the evidence and the testimony is going to prove to you, that he is guilty."

38

The State incorrectly argues that the context of the statement changes its impact. The State's opening still grouped the domestic violence and sexual abuse charges with the phrase, "[t]hey were his to touch any time he wanted in any way he wanted," in a way which invited the jury to use evidence of sexual abuse to support domestic violence and vice versa. In this way, the State's opening argument was at odds with the district court's instruction to consider each charge individually. But appellate courts apply the hypothetical presumption that the jury follows the district court's instruction to consider each charge separately, uninfluenced by their decision as to any other charge. *Cruz*, 297 Kan. at 1058. Thus, the State's comment by itself would not be sufficient to warrant reversal when considered alongside the ameliorating effect of the multiple counts jury instruction. Nevertheless, the State's comment did have an aggravating effect on the district court's error in consolidating the cases. Because the State's opening argument by itself did not clearly prejudice Ross, we determine that the State's comment is inadequate to reverse and remand solely on the grounds of prosecutorial error. But this comment does factor into our analysis under the cumulative error issue.

III. *Did the State publish inadmissible evidence requiring reversal?*

Ross argues that the State violated the district court's order in limine by playing an unredacted phone call to police. The State contends that Ross has failed to preserve the issue and that the issue has no merit.

A district court's determination on whether an order in limine has been violated is reviewed for abuse of discretion. "A trial court is generally in the best position to decide whether such a violation has occurred." *State v. Sims*, 308 Kan. 1488, 1497, 431 P.3d 288 (2018). When a party alleges that an order in limine has been violated, the district court must determine (1) whether the order has been violated, and if so, (2) whether the party alleging the violation has established substantial prejudice resulting from that violation. *City of Mission Hills v. Sexton*, 284 Kan. 414, 436, 160 P.3d 812 (2007); see *Sims*, 308

Kan. at 1497-98. Since motions in limine are granted because the excluded evidence is deemed prejudicial, violation of an order in limine intrinsically has a prejudicial effect. But not every violation of an order in limine requires a mistrial. Prejudice may be slight or subject to being cured depending on the context. 308 Kan. at 1497.

If a violation of an order in limine implicates a party's rights under the United States Constitution, the court must apply the constitutional harmless error standard to determine if the violation was harmless beyond a reasonable doubt. The appellate court will review the record as a whole, considering how the district court addressed the error as it arose and what remedial efforts, if any, it took. *State v. Santos-Vega*, 299 Kan. 11, 24, 26, 321 P.3d 1 (2014).

When the district court grants a movant's request for a continuing objection to evidence excluded by an order in limine, the contemporaneous objection rule has been satisfied and the issue is preserved for appeal. *State v. Houston*, 289 Kan. 252, 271, 213 P.3d 728 (2009). But see *State v. Bollinger*, 302 Kan. 309, 323, 352 P.3d 1003 (2015), *cert. denied* 577 U.S. 1068 (2016) ("A continuing objection does not operate prospectively to preserve review of unspecified future testimony. . . . A continuing objection does not afford the district court a realistic opportunity to know which words in a witness' lengthy testimony are considered objectionable by the defendant. [Citation omitted.]").

The State incorrectly asserts that Ross failed to preserve his issue because he did not object at trial. The district court granted Ross' standard motion in limine excluding evidence of crimes not at issue in his trial. Early in trial, the State presented testimony from A.R.'s supervisor, who called 911 on May 17, 2019, when A.R. did not come to work on time. The supervisor asked law enforcement to do a welfare check at A.R.'s home. The State published an unredacted copy of that 911 call that referenced a separate

rape allegation against Ross. On the recording, the supervisor tells the dispatcher the following:

> "We did some checking into Mr. Ross and he shows reports of a rape and intimidation of witness on the seventh of this month and eighth of this month and then a previous intimidation of [A.R.] on 10/31/18. So, y'know, he has extensive criminal history from what we're seeing initially. . . ."

Under the contemporaneous-objection rule codified at K.S.A. 60-404, a party must make a timely and specific objection at trial to preserve an evidentiary challenge for appellate review. That rule has the practical effect of confining a party's appellate arguments to the grounds presented to the district court. *State v. Scheetz*, 318 Kan. 48, Syl. ¶ 1, 541 P.3d 79 (2024). Counsel does not need to use the words "'I object'" to comply with K.S.A. 60-404. See *State v. Bowman*, 252 Kan. 883, 888, 850 P.2d 236 (1993). If the district court knows of the specific grounds for an objection and has an opportunity to rule on it, then the purposes of the contemporaneous objection rule under K.S.A. 60-404 are fulfilled. *State v. Randle*, 311 Kan. 468, 480, 462 P.3d 624 (2020).

The State's argument that Ross did not preserve an objection does not comport with the record. The district court stated on the record that counsel recognized an issue with the audio recording immediately. The record contains the following exchange:

> "[Defense counsel]: My point simply is I think we need a redacted—if that's going to go back to the jury, we need it redacted.
> "[THE COURT]: Well, that's a given. It's disappointing that that came in. So the issue is you'll get a limiting instruction if you want it. I'm not going to tell you my opinion because I don't know. You didn't object realtime [*sic*]. I mean, I looked at you and you looked at me. You were obviously on top of the situation, so I want the record to reflect that. You, I assume, made a very intentional decision not to highlight it by objecting to it and instead asked to approach. So the record should be clear that you were very much aware realtime [*sic*] of this."

The record also shows that the State stopped playing its own exhibit immediately after the word rape came out. Thus, it is readily apparent from the record that defense counsel did not have time to object to the continued playing of the State's audio exhibit because the State had already stopped the playback. Instead, counsel approached the bench and discussed the improperly admitted evidence outside of the presence of the jury. During this discussion, the State flatly stated that the evidence was not admissible. The district court's awareness of the issue and opportunity to rule on it complies with the requirements of K.S.A. 60-404. See *Randle*, 311 Kan. at 480. Thus, in substance, Ross preserved his argument that the State violated the district court's order in limine. See *Sims*, 308 Kan. at 1497.

But the second part of the State's argument has some merit. Although the record shows that Ross gave the district court an opportunity to rule on the improperly admitted evidence at trial, he did not ask for a remedy. The district court stated that Ross made the "very intentional decision not to highlight it by objecting," but Ross did not request a mistrial or an ameliorating jury instruction. Further, the State correctly notes that Ross moved for a new trial without raising the issue of the 911 call violating an order in limine. So, the State's argument is partially correct. Ross preserved his objection at trial but abandoned the issue in his posttrial motion. But Ross also raises a claim of cumulative error. In analyzing cumulative error, we determine that it is useful to finish the analysis of violating an order in limine.

If the issue were preserved, we would next analyze whether the party alleging the violation has established substantial prejudice resulting from that violation. *City of Mission Hills*, 284 Kan. at 436; see *Sims*, 308 Kan. at 1497.

On appeal, Ross argues that the jury, upon hearing of a report of an unrelated rape, may have inferred that Ross also committed the sexual abuse charges. The State argues that the reference to rape was isolated, brief, not highlighted by the parties, and was

quickly addressed. The State contends that the mention of rape in the audio recording was unlikely to cause the jury to infer that Ross had a previous record or a propensity to commit sex offenses.

Because Ross failed to preserve this issue, we need not address whether the evidentiary error resulted in prejudice. But we have previously determined that the district court erred in consolidating cases. The State's error in opening statements was otherwise a harmless error. The error in admitting prior bad acts evidence attaches to those errors to result in cumulative error which we discuss later in this opinion. We note, with the benefit of hindsight, that the State did not need to play the recording for the jury. A.R.'s supervisor and later witnesses such as A.R. established that the supervisor called 911 to report that A.R. was late for work and her lateness was likely due to domestic violence at home. No additional information was on the recording itself, other than the prejudicial statements that the supervisor made about Ross' previous law enforcement contact. We determine that this error contributed to the cumulative error committed in this trial.

IV. *Did the district court err in answering the jury's question?*

Ross argues that the district court erred in responding to the jury's request for a definition of kidnapping. The State argues that the record does not support Ross' claim.

Appellate courts review a district court's response to a jury question for abuse of discretion. *State v. Walker*, 308 Kan. 409, 423, 421 P.3d 700 (2018).

During its closing statements, the State argued that Ross committed aggravated kidnapping as follows:

43

"Then you have, finally, on Count 10 aggravated kidnapping. We're going back—I apologize for the confusing nature of that, but we're going back to the April 29th, May 1st date range to the incident in the kitchen. It's that she was confined in the kitchen, that it was done to inflict bodily injury or terrorize her. I would submit to you that firing a gun near someone's head, is it a reasonable explanation that you're doing that to wake them up or is it perhaps more reasonable that you're doing that to terrorize them? And, in fact, [A.R.] was terrorized and put in fear."

During deliberations, the jury asked the district court: "May we, the jury, receive clarification on the State's definition of kidnapping?" After consulting with the parties, the district court answered, "No. Please refer to your jury instructions." Later, the jury acquitted Ross of unlawful discharge of a firearm but convicted him of aggravated kidnapping.

On appeal, Ross argues that the jury's question expressed confusion on which specific act the State relied upon for the charge of aggravated kidnapping. Ross notes that the State's closing argument was that he discharged a firearm in the commission of aggravated kidnapping. Ross argues it was inconsistent for the jury to find him guilty of aggravated kidnapping but not guilty of discharge of a firearm.

The State correctly notes two difficulties with Ross' argument based on the record. Count 10 was not the only charge of aggravated kidnapping, and the jury did not specify which count it had in mind in asking for a definition of kidnapping. Also, Ross expands the jury's question to include concepts that the jury did not ask about. He asserts that the jury was confused about which specific act the State relied upon to support the aggravated kidnapping charge. But if the jury wished to know which act the State claimed was kidnapping, it could have phrased the question that way. It did not. Cf. *State v. Coble*, 312 Kan. 615, 621, 479 P.3d 201 (2021) (analyzing the following jury question: "'Do the three counts apply to specific locations or events *and if they do, which ones belong to which counts*?'"). Here, the jury simply asked for a definition. The jury

instructions defined kidnapping. Thus, the district court did not err in referring the jury back to the instructions.

V. *Are Ross' convictions for criminal sodomy and aggravated criminal sodomy mutually exclusive?*

Ross argues that his convictions for aggravated criminal sodomy and criminal sodomy were mutually exclusive because H.L. could not be both 13 years of age and 14 years of age at the same time. The State argues that at sentencing the prosecutor elected to proceed on only the higher severity level crime, and thus, Ross was not sentenced for two crimes.

Whether convictions are mutually exclusive is a question of law over which this court reviews de novo. *State v. Vargas*, 313 Kan. 866, 869, 492 P.3d 412 (2021).

When Dalena Mar interviewed H.L. in May 2019, H.L. told Mar about multiple incidents of sexual abuse. The State asked Mar about the interview in the following exchange:

"Q: . . . And how—I mean, I assume she didn't have a calendar in front of her. How do you orient kids when you're trying to have them tell you about this sort of thing? What do you do?
"A: We discuss, like, if they remember what grade or ask if they remember what time of the year or if it was around a specific incident, you know, in their life, birthday, Christmas, things of that sort.
"Q: So in doing it that way do you ask about the most recent incident that they recall?
"A: Yes. Usually we try to ask about the last incident and then the first incident and if there's any other instances that stand out or that they can tell us about."

H.L. told Mar about an incident that occurred in winter. Mar testified about H.L.'s inability to provide a specific date as follows:

45

"Q: And this incident, did she put a time frame on this second incident where there was penetration?

"A: Yes. She said she thought it was either December or January and that she thought it would have been early January due to the baby had not been born yet."

H.L.'s birthday is January 9.

The State charged Ross with aggravated criminal sodomy, alleging that he engaged in sodomy with H.L. between December 1 and January 7 as count 2 of 19CR2036. In count 2, aggravated criminal sodomy, the State alleged that H.L. was under the age of 14 years.

In the alternative in count 3, the State charged Ross with criminal sodomy, alleging that Ross engaged in sodomy with H.L. between January 8 and February 1, when H.L. was 14 or more years of age but less than 16 years of age. Nothing in the record explains why the State charged this count to include the day before H.L.'s birthday. The State's error seems inadvertent.

During closing argument, the State explained to the jury that it would need to determine when the incident occurred as follows:

"With respect to Count 2, this is going to be the aggravated criminal sodomy count. It would probably be most helpful to read Counts 2 and 3 together because they're talking about the same incident. The difference between the two is one is aggravated criminal sodomy and one is criminal sodomy. You're like what's the difference. We're talking about the same incident. You have to decide between the 12 of you that are going to deliberate whether you unanimously agree that that incident of oral contact with [H.L.]'s genitals occurred before or after her birthday. That's what that's about."

46

The district court instructed the jury to find Ross guilty of aggravated criminal sodomy if it found that H.L. was under 14 years old when the incident occurred. The district court instructed the jury to find Ross guilty of criminal sodomy if it found that H.L. was 14 or 15 years old when the incident occurred. The jury convicted Ross of both counts.

When Ross moved the district court for a new trial, he argued that the jury returned a legally impossible verdict. In its response, the State argued that the evidence at trial did not just support one instance of sodomy between December 1 and February 1. The State contended that the jury could have found that one incident occurred before H.L. turned 14 years old and another incident after she was 14 years old.

To support this argument, the State asserted that evidence of multiple incidents of sexual conduct during this period came in through testimony of H.L., Detective Brock, and Detective Latavia Klumpp. But, as defense counsel pointed out at sentencing, the State's assertion was incorrect because Klumpp never testified at trial. Mar testified that Klumpp was unavailable because she was on medical leave. Brock testified that she was not involved in the case of H.L.'s and D.L.'s sexual abuse allegations. And H.L.'s testimony did not establish that two incidents occurred between December and January. Testimony establishes that one incident had occurred in that time, with H.L. testifying it occurred "after Christmas" and Mar testifying that H.L. initially thought it was early January because A.R. and Ross' baby had not been born yet. On appeal the State abandons any claim that two separate incidents between December and January could support the jury's verdicts on count 2 and count 3 of 19CR2036. See *State v. Littlejohn*, 298 Kan. 632, 655-56, 316 P.3d 136 (2014) (holding that an issue not briefed is deemed abandoned).

In opposing Ross' motion for a new trial, the State also argued that one criminal sentence equals one conviction as follows:

47

"[B]ecause the counts are charged in the alternative, the State will have to further elect only one count to proceed on at sentencing. Thus, defendant will only be convicted of one of the two counts. Each count on its own was specific, elected by the State, and supported by substantial evidence. Thus, defendant will not be prejudiced."

The State's response to Ross' motion did not provide a citation for electing to proceed on one count at sentencing. Also, the State did not explain how the lack of a sentence would negate the fact of a jury conviction.

At sentencing, the State repeated its contention that it elected to pursue count 2, the aggravated criminal sodomy charge. The State's election led to the following exchange:

"[THE COURT]:  I would note that the State is electing on 19CR2036 Count 2, which is the aggravated criminal sodomy. By that election, on the first page of the [presentence investigation report], Count 3 in 19CR2036 is—
"[THE STATE]:  There's actually a term of art I believe we should probably use. It merges.
"[THE COURT]:  Thanks for that. I was struggling.
"[THE STATE]:  It's a new case, Your Honor, under *State vs. Vargas*. That's going to be a July 30th, 2021 Supreme Court case, 313 Kan. 866, where alternatively charged counts result in multiple guilty verdicts for alternative ways of committing one crime, when multiple verdicts should be merged into one conviction.
"[THE COURT]:  What I believe the result of that would be is that Count 4 becomes the primary crime that controls the base sentence of that case. But since these are consolidated cases, that criminal history as reflected in the [presentence investigation report] would remain at criminal history I. It would not be criminal history C under any circumstance. The State has elected and they merge."

Our Supreme Court has held that mutually exclusive verdicts cannot stand. See *State v. Williams*, 308 Kan. 1439, 1449-50, 430 P.3d 448 (2018). The *Williams* court outlined the test as follows:

> "Mutually exclusive verdicts include: (1) those that are a legal impossibility, such as guilty verdicts on both a greater and its lesser included offense and (2) those that purport to establish a defendant's guilt for two separate and distinct criminal offenses, the nature of which are such that guilt of one necessarily excludes guilt of the other—that is, when a conviction as to one of the crimes negates an element of the other." 308 Kan. 1439, Syl. ¶ 3.

The jury convicted Ross of aggravated criminal sodomy and its lesser included offense of criminal sodomy. Also, the jury found that H.L. was simultaneously 13 and 14 years of age, meaning that the conviction of one crime negated the age-of-victim element of the other crime. So, the convictions are mutually exclusive and logically inconsistent.

The State argues that Ross' citation to *Williams* is inapposite because *Williams* is factually distinguishable. But Ross does not cite *Williams* for its facts. He asks us to apply its reasoning in determining whether two convictions are mutually exclusive. If we find that they are mutually exclusive, then only one of Ross' convictions will stand. See *State v. Garza*, 290 Kan. 1021, Syl. ¶ 5, 236 P.3d 501 (2010) ("When a defendant has been charged in the alternative, the defendant may be convicted of only one of the alternative offenses."). On appeal, as before the district court, the State argues that *Vargas* applies.

Dominic Vargas saw a police officer activate his lights and siren and "'floored it'" to escape the officer. *Vargas*, 313 Kan. at 867. Vargas exceeded 120 mph in a 50-mph zone and committed numerous traffic violations. The State charged Vargas with fleeing or attempting to elude an officer under K.S.A. 2015 Supp. 8-1568(b)(1)(E), alleging that Vargas committed five or more moving violations. In the alternative, the State charged fleeing or attempting to elude an officer under K.S.A. 2015 Supp. 8-1568(b)(1)(C), alleging reckless driving. Both crimes were a severity level 9 person felony under K.S.A. 2015 Supp. 8-1568(c)(2). The jury found Vargas guilty of both charges.

In *Vargas*, our Supreme Court referred to the earlier cases of *State v. Sullivan*, 224 Kan. 110, 578 P.2d 1108 (1978), and *State v. Jackson*, 223 Kan. 554, 575 P.2d 536 (1978). In each case, the State charged the defendant with premeditated murder, and in the alternative, felony murder. In each case, the jury returned two convictions for one murder, finding that the State had proved both premeditation and felony murder. *Sullivan*, 224 Kan. at 112; *Jackson*, 223 Kan. at 557. In *Sullivan*, our Supreme Court was unequivocal that only one conviction could result, whereas in *Jackson*, our Supreme Court apparently let both convictions stand but did not reverse because Jackson only received one sentence. *Vargas*, 313 Kan. at 871-72. The *Vargas* court held that when a jury convicts a defendant on two different means of committing the same crime, the verdicts merge into one single conviction. 313 Kan. at 875.

The State cites *Vargas*, but seemingly misses an important difference. The jury found Vargas guilty of severity level 9 felony fleeing or attempting to elude an officer under K.S.A. 2015 Supp. 8-1568(b)(1). Whether the jury intended to convict under (b)(1)(E) or (b)(1)(C), it would still be the same crime with alternative means. And the *Vargas* court cited cases in which the jury convicted the defendant of first-degree murder, whether it was premeditated or felony murder. Here, Ross was found guilty of committing two different crimes: aggravated criminal sodomy and criminal sodomy.

Before the district court and again on appeal, the State claims that the solution to this mismatch is for the State to elect which conviction to proceed with at sentencing. But the State cites no authority stating that, when a jury returns mutually exclusive verdicts, the resolution is for the prosecution to simply choose which crime it would like the defendant to be convicted of. This loose contention is as unsupported as the State's claim before the district court that evidence for the conviction came from Detective Klumpp—a witness who never testified.

50

Our Supreme Court has provided Kansas courts with the remedy for mutually exclusive jury verdicts in *State v. Hernandez*, 294 Kan. 200, 207, 273 P.3d 774 (2012):

> "A mistrial was appropriate under K.S.A. 22-3423(1)(b) because these verdicts are legally and factually inconsistent. The trial court could not legally enter judgment on either verdict because the jury's finding on the other verdict precludes such judgment. Aggravated indecent liberties with a child requires a completed crime. Attempted aggravated indecent liberties with a child requires that the crime was not completed. Logic prevents these crimes from merging, and K.S.A. 21-3107(2)(c) prohibits conviction of both the crime charged and an attempt to commit the crime charged."

The jury's verdicts here are analogously irreconcilable. The jury found Ross guilty of engaging in criminal sodomy at a time when H.L. was simultaneously 14 and not 14 years of age. The jury's verdicts violate one of the three principles of logic ultimately derived from Aristotle: identity, noncontradiction, and excluded middle.

The law of identity holds that A is A. The law of noncontradiction holds that no statement can be both true and false—that is, an object cannot fall into the categories of A and Not A at the same time. And the law of the excluded middle holds that any statement is either true or false—thus, A or B, and not A and B. Rubinson, *Client Counseling, Mediation, and Alternative Narratives of Dispute Resolution*, 10 Clinical L. Rev. 833, 834 n.5 (2004); Glenn, *The Cosmopolitan State*, 61 U. Kan. L. Rev. 735, 750 (2013); Wiseman, *Ethical Jurisprudence*, 40 Loy. L. Rev. 281, 297 (1994).

Here, the jury verdicts violate the law of noncontradiction. What this means is that a statement cannot be true and false at the same time. First, for example, the jury verdict shows that the jury convicted Ross of aggravated criminal sodomy of H.L. because she was under 14 years of age when the crime was committed. Second, the jury verdict also shows that the jury convicted Ross of the lesser included offense of criminal sodomy of H.L. because she was 14 years of age or older when the crime was committed. These two

opposing propositions are logically contradictory, mathematically speaking, because of the age of H.L. when the crime was committed. To illustrate, if the first is true (the jury convicted Ross of aggravated criminal sodomy of H.L. because she was under 14 years of age when the crime was committed), the second is false; if the first is false, the second is true (the jury convicted of Ross of the lesser offense of criminal sodomy of H.L. because she was 14 years of age or older when the crime was committed).

Thus, these two contradictory propositions cannot be correlated as two steps in an argument. Indeed, the two propositions can never be true together, or false together: One is always true and the other always false. It is like saying, for instance, *it is both raining and not raining in the same place and at the same time*. So, the law of noncontradiction shows us that this cannot be true and false in the same sense at the same time.

Counts 2 and 3 both related to a single allegation of criminal sodomy based on one incident. When the incident occurred, H.L. was either 14 years old or she was under 14 years old. In fact, the State's closing argument directed the jury's attention to the fact that they would need to determine her age before deciding which crime to convict Ross on. The fact that the jury found that she was both at least 14 years old and under 14 years of age requires this court to reverse and remand under *Hernandez*, 294 Kan. at 207. Even if remand was not required for this error alone, we still hold that the jury's inconsistent verdicts contributed to the cumulative error depriving Ross of a fair trial.

VI. *Did cumulative error deprive Ross of a fair trial?*

Ross argues that cumulative error deprived him of a fair trial. The State asserts that no trial errors occurred.

"Cumulative error analysis aggregates all errors and assesses whether their cumulative effect is such that they cannot be determined to be harmless, even though

individually those errors are harmless. [Citation omitted.]" *State v. Carr*, 314 Kan. 615, 721, 502 P.3d 546 (2022). Cumulative errors may require reversal when the totality of the circumstances establishes that the defendant was substantially prejudiced by the errors and denied a fair trial. In assessing the cumulative effect of errors during trial, appellate courts examine the errors in context, consider how they were dealt with, the nature and number of errors and whether they were interrelated, and the strength of the evidence. If any of the errors being aggregated are constitutional, the party benefiting from the error must establish beyond a reasonable doubt that the cumulative effect did not affect the outcome. *State v. Alfaro-Valleda*, 314 Kan. 526, 551-52, 502 P.3d 66 (2022).

We have identified four errors in Ross' trial, and when considering those errors in aggregate we conclude that Ross was denied a fair trial. First, the district court erred by consolidating all five cases when Ross conceded that the three complaints of violating a protective order could join, while opposing consolidation of the two felony cases. This case is like this court's decision in *Coburn*, including the charges of aggravated indecent liberties with a child. See 38 Kan. App. 2d at 1042. When this court decided *Coburn*, the evidence of sexual exploitation of a child would have been inadmissible propensity evidence under K.S.A. 60-455 and so Coburn could show that he was prejudiced by joinder. Since *Coburn*, our Legislature amended K.S.A. 60-455 such that evidence of sexual misconduct is admissible, but only in a criminal action in which the defendant is accused of a sex offense. Thus, the *Coburn* court's analysis would no longer apply in cases in which all crimes charged are sex offenses. Ross did not argue, and could not argue, that evidence of sexual misconduct against H.L. prejudiced him on charges related to D.L. and vice versa. But the *Coburn* court's analysis remains valid as to the other crimes charged and should have guided the district court to arrive at the same outcome: separate trials.

Second, the prosecutor's erroneous statements directly exacerbated the effect of improper joinder because the prosecutor asked the jury to consider the charges

collectively as a course of conduct. Third, the jury heard A.R.'s supervisor state on the 911 call that Ross had been accused of rape in an incident which was not part of the charged conduct. And fourth, the jury returned verdicts finding that Ross committed criminal sodomy with H.L. when she was both under 14 years of age and 14 years of age or older at the same time when the crime was committed. The first three errors tended to prejudice the jury, and the fourth error of logically inconsistent guilty verdicts tends to show that the jury was actually prejudiced. The combined effect of these errors exceeded the adverse effect of each error alone. See *State v. Gleason*, No. 125,156, 2024 WL 392001, at *12 (Kan. App. 2024) (unpublished opinion), *petition for rev. filed* March 1, 2024. The improper consolidation, admission of inadmissible evidence, and mutually exclusive jury verdicts could each constitute reversible error potentially, but we need not analyze them individually when certainly together they constitute cumulative error requiring reversal and remand.

For the preceding reasons, we reverse Ross' convictions and remand for further proceedings consistent with this opinion.

Reversed and remanded with directions.